Daniel Marino (Pro Hac Vice Application Being Submitted)
Sarah E. Kleven (State Bar No. 230408)
(Application for Admission being Submitted)
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, N.W.
Washington, DC  20004-2415
Phone:  (202) 383-0100
Fax:  (202) 637-3563

Janine D. Bloch (State Bar No. 148377)
D. Lilah McLean (State Bar No. 203596)
Preston Gates & Ellis LLP
55 Second Street, Suite 1700
San Francisco, California  94105-3493
Phone:      (415) 882-8200
Fax:          (415) 882-8220

Attorneys for Plaintiff
DENNIS T. MANGANO, PH.D., M.D.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS T. MANGANO, Ph.D., M.D.,<br><br>                                    Plaintiff,<br><br>          v.<br><br>UNITED STATES OF AMERICA,<br><br>                                    Defendant. | Case No. C 05 2836 PJH<br><br>**COMPLAINT** |

## I.  INTRODUCTION AND SUMMARY OF THE CASE

1.       Plaintiff Dennis T. Mangano,  Ph.D., M.D. ("Dr. Mangano"), a respected doctor and researcher, brings this action for intentional infliction of emotional distress and interference with right to practice a lawful profession because the San Francisco Veterans Affairs Medical Center (SFVAMC or Medical Center) and its personnel, without justification, ruined his career as a clinician and as a clinical researcher.   In the process they set out to fire him and to humiliate him because he reported unsafe practices and procedures involving the medical care of Veterans.

COMPLAINT                                          1.                    *PRINTED ON RECYCLED PAPER*

2.      While serving in a part-time position as a staff anesthesiologist at the Medical Center—a position that he held for more than 20 years—Dr. Mangano learned that Medical Center personnel were secretly removing patient care equipment from the operating rooms, using it in contaminated animal labs on pigs and sheep, and then bringing it back to be used on unsuspecting sick Veterans, that is commingling animal research with the treatment of Veterans.

3.      Dr. Mangano objected to this practice and reported it to the Medical Center Director. Thereafter, the Medical Center personnel involved began a campaign to fire Dr. Mangano and to ruin his career by, among other things, abusing the quality assurance process and raising unwarranted issues regarding Dr. Mangano's patient care, while ignoring serious quality issues which existed at the Medical Center.  Largely successful in their efforts, the Medical Center and its personnel caused Dr. Mangano significant damages for which he now seeks compensation.

4.      As a part-time employee, Dr. Mangano has no direct appeal rights under the Civil Service Reform Act and his specific causes of action are not exempted, for any reason, under the Federal Tort Claims Act.

## II.  PARTIES, JURISDICTION, AND VENUE

5.      This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80.

6.      Plaintiff, Dennis T. Mangano, resides at 30 Genera Road, Hillsborough, California, 94010, such that venue is proper in this Court pursuant to 28 U.S.C. § 1402(b).

7.      Pursuant to 28 U.S.C. § 2675(a), Plaintiff submitted the claims set forth herein to the Department of Veterans Affairs on April 22, 2002.  The Department denied his claims on October 1, 2003.  Dr. Mangano submitted a request for reconsideration of the denial on March 11, 2004.  The Department denied his request for reconsideration on January 14, 2005.  Dr. Mangano timely files this Complaint within 6 months of the final denial of his claims.

### III.  INTRADISTRICT ASSIGNMENT

8.      Pursuant to Civil Local Rule 3-2(c) and (d), assignment in this district is proper in that a substantial part of the events or omissions which give rise to the claims occurred in this judicial district and arose in San Francisco County.

### IV.  FACTS COMMON TO ALL COUNTS

A.      **Mangano Background**

9.      Plaintiff Dennis T. Mangano was appointed to his part-time position at the Medical Center pursuant to 38 U.S.C. § 7405(a)(1) on December 15, 1991.  He practiced and taught Medicine at the SFVAMC from July 1977 until May 2001.  At the SFVAMC, Dr. Mangano directed the VA Surgical Intensive Care Unit for 14 years and chaired the VA Emergency Medical Care Committee for 7 years.

10.      As a staff anesthesiologist, Dr. Mangano, in addition to ensuring the patient's comfort during surgery, was responsible for monitoring and regulating critical life functions, such as breathing, heart rate, heart rhythm, and blood pressure, as they are affected by the surgery being performed.  Dr. Mangano specialized in high-risk cardiac surgery and was recognized internationally as an authority in this field.

11.      Dr. Mangano is a world-renowned clinical researcher in the field of Perioperative Medicine.  His research has focused on clinical studies of high-risk patients undergoing surgery.  His research in this field has been cited repeatedly in national and international publications, in all media forums, and recognized as exemplary by the University of California, countless peer groups, and the United States Congress.

12.      Prior to 1997, Dr. Mangano's performance evaluations had always contained ratings of "High Satisfactory" and "Outstanding" in all categories.  Dr. Mangano's research was one of the

principal reasons that the Medical Center was awarded one of the 5 Centers of Excellence Awards by the VA for Cardiac Surgery.

13.    In 1987, Dr. Mangano formed a non-profit foundation called Ischemia Research and Education Foundation (IREF), which is dedicated to the study of heart attack and stroke.  This Foundation has been responsible for some of the most important research and findings in this area. As a result, prior to the events outlined below, Dr. Mangano was sought after by drug companies and other entities throughout the world for his skills as a researcher.  Prior to the events described below, he had formed important relationships with such entities that would have been quite lucrative for him and IREF.

14.    Prior to his termination, Dr. Mangano had founded Advanced Genomic Therapeutics Company (AGTC) to identify, develop, and market novel heart attack, heart failure and stroke therapies, initially focusing on the high-risk cardiac surgery patient and the acutely ischemic medical patient.  Prior to the events described below, Dr. Mangano, with his foundation, IREF, was uniquely positioned to develop two promising therapies for surgical patients, Acadesine and GP531, because he had acquired their worldwide licenses and planned to work with his foundation and an affiliated research consortium to develop and obtain approval of these compounds.

**B.    The Department of Veterans Affairs and the Veterans Healthcare System**

15.    The mission of the Veterans Healthcare System is to serve the needs of America's Veterans by providing primary care, specialized care, and related medical and social support services.

16.    Such care is provided through the Veterans Health Administration (VHA), the largest, integrated-health-care provider in the United States.  The VHA is organized into 21 regional Veterans Integrated Service Networks (VISNs).   The SFVAMC falls within VISN 21, the Sierra Pacific Network.

COMPLAINT                                        4.                        *PRINTED ON RECYCLED PAPER*

17.     The SFVAMC is charged with providing health care to Veterans throughout Northern California.  For 30 years it has been affiliated with the University of California, San Francisco, School of Medicine.

18.     The SFVAMC also permits and encourages funded research programs, administering the largest VA research foundation in the United States.

19.     The SFVAMC is organized, in part, by service, including the Surgical Service and the Anesthesia Service.  Service Chiefs are appointed to supervise each service.  During the relevant time period, Dr. Brian Cason served as Chief of the Anesthesiology Service for SFVAMC.

20.     The Service Chiefs, including Dr. Cason, reported to the Chief of Staff of the SFVAMC, with the Chief of Staff reporting to the Medical Center Director.  During the relevant time period, Ms. Sheila Cullen served as Director.

**C.    Dr. Mangano Learns About and Reports Use of Veteran Hospital Equipment in Animal Research**

**1.  The June 1997 TEE Incident**

21.     In June of 1997, Dr. Mangano was in the operating room suite at the Medical Center preparing to care for a Veteran who was awaiting heart surgery.

22.     In order to monitor the Veteran during surgery, Dr. Mangano needed a device called a transesophageal echocardiogram (TEE) machine.  The TEE consists of a Hewlett Packard ultrasound machine and various probes.  The TEE allows a doctor to look at the heart from a probe that is passed into the esophagus.  This test provides clear images of many parts of the heart structure and blood flow, serving as a helpful tool to monitor patients during surgery.  A very expensive piece of equipment—valued at approximately $200,000—the Medical Center owned only one TEE dedicated to the care of Veterans undergoing surgery.

COMPLAINT                                                    5.                          *PRINTED ON RECYCLED PAPER*

23. Initially, Dr. Mangano could not locate the TEE and, upon inquiring with the staff, learned that his Service Chief, Dr. Cason, had removed the TEE from the operating room and taken it to the animal lab. Dr. Mangano immediately attempted to contact Dr. Cason; when he did, however, Dr. Cason was evasive regarding the location of the equipment. Dr. Mangano told Dr. Cason of his immediate need for the TEE.

24. A short while later, Dr. Mangano encountered Dr. Cason attempting to return the TEE to the operating room. Dr. Mangano observed that the machine had not been cleaned thoroughly and, in fact, had remnants of blood on it, apparently from the animals.

25. Dr. Mangano objected to Dr. Cason's attempt to return the machine to the sterile operating room environment and refused to use the machine until the issue was addressed by infectious disease control personnel. On her own, a nurse prepared and submitted a complaint regarding this incident to the Medical Center Quality Assurance office.

### 2. Dr. Mangano Files a Formal Complaint

26. Over the next few months, Dr. Mangano learned that it had been a practice of Dr. Cason and other physicians involved in animal research at the Medical Center to use equipment again in Veterans.

27. In fact, in other proceedings, at least one current official at the Medical Center, Dr. Arthur Wallace, confirmed that this was and still is a common practice at the SFVAMC. Dr. Wallace also confirmed that many types of surgical equipment—including biomedical equipment such as anesthesiology machines, defibrillators, and other equipment, as well as surgical instruments such as retractors, needle-holders, and other implements—is used in animals and then in unsuspecting Veterans undergoing surgery.

28. The Medical Center also permits researchers to bring animals into the Center itself to use equipment intended for use on Veterans on the animals. This was apparently a common practice

at the time that Dr. Mangano registered his complaints and, according to sworn testimony from current employees of the Medical Center, continues to this day.

29.     During 1997 and 1998, Dr. Mangano refused to use the animal-contaminated TEE equipment on Veterans, electing instead to rent, with his personal funds, a TEE from Hewlett Packard to use on the Veterans in his care.

30.     During 1997, Dr. Mangano began to notice an increase in serious chest wall infections in veterans at the Medical Center.  In September of 1997, he reported to the Medical Center Director, Sheila Cullen, his concerns about the use of surgical equipment in the animal labs and what he believed were increased instances of serious chest wall infections.

31.     Director Cullen directed that an Administrative Board of Inquiry (ABI) be conducted. The ABI determined that Dr. Cason's practices violated at least an unwritten policy of the  Medical Center prohibiting the use of surgical equipment in animals and later use in Veterans.  The ABI recommended that Dr. Cason be disciplined for what the ABI concluded was "unethical" conduct. However, he was never disciplined but instead promoted to the Chair of the Operating Room Committee.

32.     On information and belief, the Medical Center never advised the Veterans, or their families, who had serious chest wall infections of the fact that the equipment that had been used on them had also been used in pigs, sheep, and other animals in the Medical Center.  Nor has the Medical Center ever obtained consent from any Veteran, or any family members, for the use of equipment on them that has previously been used for animal research.

33.     Moreover, it does not appear that the Medical Center had or has any policies in place for detecting, monitoring, or controlling incidences of known zoonosis or emerging infectious diseases which may originate from animals.

COMPLAINT                                         7.                          *PRINTED ON RECYCLED PAPER*

**D.    The Medical Center's Campaign to Deprive Dr. Mangano of His Career**

**1. Dr. Cason Abruptly Begins to Complain About Dr. Mangano**

34.    Immediately after Dr. Mangano raised his concerns about the commingling of animal research with treatment of Veterans, his supervisor, Dr. Cason, became determined to ruin Dr. Mangano's career. Dr. Cason began by registering unwarranted formal complaints about Dr. Mangano. It is noteworthy that until this time, Dr. Mangano had never received any such complaints.

35.    Dr. Cason drafted a memorandum to Dr. Mangano, which he provided to others, complaining that Dr. Mangano had failed to respond to pages.

36.    Dr. Cason followed up over the next two years, with additional memoranda, complaining that Dr. Mangano was late for work, that he improperly switched on-call responsibilities with other physicians, about his use of the telephone for personal calls, about his reporting of his hours, and countless other minor issues. Never in his career had Dr. Mangano received such complaints. Nor can anyone point to instances where other physicians at the VA received such complaints.

37.    In addition to the plethora of baseless complaints, Dr. Cason blocked Dr. Mangano's request to serve on the Pharmacy and Therapeutics Committee.

38.    Dr. Cason refused to prepare performance evaluations for Dr. Mangano for two years. And when he finally did prepare one, he gave Dr. Mangano unprecedented and unwarranted adverse scores and remarks.

39.    Without any authority, Dr. Cason announced that Dr. Mangano would be leaving the Medical Center at a meeting of the Anesthesiology Service.

40.    For months, he repeatedly reprimanded Dr. Mangano, admonishing him for the way in which he completed his time-cards and scheduled his work days.

### 2. In an Effort to Have Him Fired by the University, Dr. Cason Gives False Testimony to the Privilege and Tenure Committee

41.     The timing was unfortunate for Dr. Mangano.  At the time, Dr. Mangano and his foundation were involved in a long-running dispute with the University of California regarding payment of indirect costs for research programs that Dr. Mangano, a UC Faculty member, was conducting.  This was, at its base, a complicated financial dispute that led to a Privilege and Tenure Committee (P&T Committee) Proceeding against Dr. Mangano personally.

42.     In furtherance of his efforts to ruin Dr. Mangano's career, Dr. Cason, as Dr. Mangano's supervisor, offered false testimony to the P&T Committee.  Dr. Cason's testimony carried substantial weight; Dr. Cason was Dr. Mangano's only supervisor and he provided damaging testimony.  Specifically, on July 28, 1998, Dr. Cason declared under penalty of perjury to have personal knowledge of the "fact" that "of a total of 19 employee grievances in the UCSF Department of Anesthesia for the 1994-1995 period, approximately 17 of them were against Dr. Mangano."  Not only was this statement false, but Dr. Cason lacked any factual basis for it other than a statement he believed to have heard someone else make.  Nevertheless, this false statement had a devastating effect upon the deliberations of the P&T Committee and ultimately led to Dr. Mangano's temporary suspension by the University.

43.     Dr. Cason continued to accost Dr. Mangano with threats to get him fired, with assertions that the Medical Center did not need Dr. Mangano's services, and claims that there was "a good chance" Dr. Mangano would be fired by UCSF because of Dr. Cason's testimony against him.

44.     At the time, Dr. Mangano was on a voluntary unpaid leave of absence from UCSF, which he had taken to reduce his stress levels from interactions with University officials.  Dr. Mangano had taken this step in July of 1998 because of the ongoing dispute with the University regarding the indirect cost issue.  Seeing no fruit from his other tactics, Dr. Cason challenged

whether Dr. Mangano could continue to treat patients at the Medical Center since he was on "stress-related" leave.

45.     Dr. Mangano countered that his stress was no greater than that of other physicians who practiced although they were experiencing life-stressors such as divorce.  Under Dr. Cason's direction, the VA's  Professional Standards Board (PSB) reviewed Dr. Mangano's fitness in a vain attempt to dismiss Dr. Mangano.  The PSB, nevertheless, renewed Dr. Mangano's privileges at the Medical Center.

### 3.  Dr. Cason and Others Abuse the Quality Assurance Process to Have Dr. Mangano Removed

#### a.  Dr. Cason Criticizes Dr. Mangano's Patient Care

46.     Having failed in his many attempts to dismiss Dr. Mangano or force him to leave, Dr. Cason began, in October of 1999, looking for ways to criticize Dr. Mangano's patient care by abusing the Quality Assurance (QA) process at the hospital.  Notably, Dr. Mangano's clinical performance throughout his prior 22 years at the Medical Center had been outstanding and highly respected by surgeons, nurses, Medicine, Cardiology, and the VA administration—entrusting him for multiple years specifically to direct Intensive Care (in addition to his Operating Room responsibilities) and oversee the Emergency Room Resuscitation Committee for the entire Medical Center.

47.     In October of 1999, Dr. Cason inappropriately criticized Dr. Mangano's handling of an ICU patient—whose life Dr. Mangano had actually saved—by arguing that Dr. Mangano had not "communicated effectively" with Dr. Wallace, whose patient this was.  He criticized the fact that Dr. Mangano had entered the room uninvited, even though the patient was in serious danger of a heart attack or a stroke and was not being aggressively treated by Dr. Wallace.

**b.  The April 24, 2000 Incident**

48.     On April 24, 2000, Dr. Mangano was the attending anesthesiologist for a man who was about to undergo heart by-pass surgery.  As is normal, the resident was attempting to intubate the patient, i.e., to place a breathing tube into the patient's trachea.  But the intubation proved to be difficult.  After several attempts by the resident, Dr. Mangano attempted it.

49.     The cardiac surgeon, Dr. Mark Ratcliff, became impatient and intervened.  Despite the fact that the patient remained absolutely stable and no emergency existed, Dr. Ratcliff performed a cricothyroidotomy, a procedure whereby he surgically opened a hole in the patient's windpipe to insert a tube to deliver oxygen to the patient.  This can be an acceptable practice if attempts at intubation are unsuccessful and surgery is to be performed so Dr. Mangano raised no objection.

50.     Once he opened a surgical airway, however,  Dr. Ratcliff inexplicably canceled the surgery.  Dr. Mangano was shocked and questioned Dr. Ratcliff's decision, saying that if Dr. Ratcliff was going to cancel the surgery, Dr. Mangano could have just awoken the patient.  In other words, the cricothyroidotomy was unnecessary unless the heart surgery was going to take place.

**c.  The Unwarranted QA Proceeding**

51.     Within days, Dr. Cason advised Dr. Mangano that he would have to respond to a "focused quality improvement review regarding the handling of this patient."  Dr. Cason gave Dr. Mangano fewer than 24 hours to explain his "management" of the patient's airway.

52.     The next day Dr. Cason conducted an unprecedented proceeding.  He held what he called a QA meeting on an emergency basis, allowing non-anesthesiology staff to attend and focusing on only one case: Dr. Mangano's.  Furthermore, he used a voting procedure that had never been used before and has never been used since.

53.     Dr. Cason quizzed Dr. Mangano for over an hour regarding his handling of the patient, despite the fact that it was not Dr. Mangano but the surgeon, Dr. Ratcliff, who made the decision to give the patient a cricothyroidotomy and then cancel the surgery.

### d.  The May 17, 2000 Incident/Administrative Leave

54.     On May 17, 2000, Dr. Mangano responded to a Code Blue—an emergency—where a patient went into respiratory arrest.  Dr. Mangano responded to this emergency and stabilized the patient and transferred the patient to the Intesive Care Unit (ICU) for continued care.

55.     Once the patient was stabilized in the ICU, Dr. Mangano reviewed the patient's records and determined that the patient had been scheduled for surgery, had become agitated for unknown reasons, and the surgery was canceled.  Because such agitation may arise from lack of oxygen, it is essential that the patient be assessed immediately.  However, Dr. Mangano learned that essentially nothing was done and the patient had been transferred back to the ward with no physical examination, no laboratory tests, no oxygen in transport, and no other follow up.  Subsequently, upon being transferred to the ward, the patient stopped breathing and an arrest (Code Blue) was called, as mentioned above.

56.     Believing that this was inadequate care, Dr. Mangano filed a special incident report with the Quality Assurance (QA) office in the early afternoon of the same day.  The QA office informed Dr. Cason of the report.

57.     Within hours thereafter, Dr. Cason informed Dr. Mangano that he was placing him in a "non-duty status."  He was, in essence, banning him from working or treating patients.  Dr. Cason also informed Dr. Mangano that the Medical Center Director was convening an Administrative Board of Investigation (ABI) regarding Dr. Mangano's handling of the patient on April 24, 2000.  In essence, by this one act, after 23 years as a physician, the Medical Center stripped Dr. Mangano of his ability to practice clinically or conduct research in a clinical setting.  He has not practiced since.

COMPLAINT                                   12.                         *PRINTED ON RECYCLED PAPER*

58.     Dr. Mangano, understandably, was upset by this, knowing the very serious implications of this virtually unheard of action and the devastating impact it could have on his career, and complained to Dr. Cason, Dr. Ratcliff, and others involved in the unwarranted QA review.  Dr. Cason's response was to report this to Director Cullen.

### e. Dr. Mangano is Banished from the Medical Center

59.     On May 19, 2000, in an unprecedented action, Dr. Cullen issued a memorandum to Dr. Mangano banning him from the Medical Center premises until further notice.  Since that date, Dr. Mangano has not been permitted to return to the Medical Center without express permission from Director Cullen.  This action, by itself, caused Dr. Mangano deep embarrassment and humiliation as it was treatment that is normally reserved, in a hospital setting, for doctors who have assaulted a patient, stolen and abused drugs during performance of clinical duties, or committed similar egregious misconduct.

60.     Even after he was terminated, and was told to clean out his office, he requested that he be permitted to do so on a weekend when fewer people would be around.  In an effort to humiliate him further, the Medical Center refused him permission to do so and demanded that he come in during normal business hours.

### f. Dr. Mangano is Fired, Even Though Exonerated by the ABI

### i. The ABI Exonerates Dr. Mangano

61.     During the summer and fall of 2000, the ABI took testimony from Dr. Cason, Dr. Mangano, and others.  The ABI examined various allegations, including that:

- Dr. Mangano had "inappropriately managed the patient's airway."
- Dr. Mangano had "failed to adhere to [VA] standards for … supervision of students."
- Dr. Mangano had "failed to communicate with [Ratcliff] on alternate intubation backup strategies."
- Dr. Mangano had failed to advise Ratcliff of the patient's status prior to the cricothyroidotomy.
- There was a loss in confidence in Dr. Mangano, among his peers and staff.

COMPLAINT                                           13.                     *PRINTED ON RECYCLED PAPER*

- Dr. Mangano's failed attempts to find coverage for April 24, 2000, impacted his emotional state that day.

62.     On October 26, 2000, the ABI rejected claims that Dr. Mangano had violated any standards of care or that he had breached any standards for supervision of residents.  It concluded that there was "a lack of communication between [Dr. Mangano] and [Dr. Ratcliff]," resulting in "an unnecessary procedure on the patient's airway."   The ABI determined that this was a "mutual obligation" of Dr. Mangano and Dr. Ratcliff and recommended that this finding be addressed by Dr. Ratcliff's Service at the Medical Center.

63.     The only person, the ABI found, who had lost confidence in Dr. Mangano was Dr. Ratcliff.

64.     The ABI did determine that Dr. Mangano's interaction with some of his peers during the above-described QA process had been "less than professional and collegial."  But the ABI also concluded that the manner in which Dr. Cason conducted that process had "departed from past practices" and this understandably contributed to Dr. Mangano's reaction to the process.

65.     In summary, the ABI for the most part rejected the allegations against Dr. Mangano and questioned the fact that many of them had been brought in the first place.  One of the recommendations the ABI made was that the QA process be "better defined" and that selection of cases and voting procedures be "standardized."

### ii.  Dr. Mangano is Terminated

66.     This did not stop Dr. Cason or the Medical Center.  Rather than advise Dr. Mangano that the ABI had cleared him and permit him to return to his duties, they delayed for two months after the ABI issued its report to ask for certain inconsequential clarifications.

67.     This lengthy delay in completing the ABI process—while Dr. Mangano's career was being eradicated—was in clear violation of the VA's own rules.  The VA Manual mandates that "[i]f an investigation is required, the Report of Investigation will be submitted to VA Central Office

within 30 calendar days." Despite this clear requirement, the report was not issued until nearly four months after the investigation commenced. And the requested clarifications were not provided until nearly 9 months after the investigation began.

68. A rather mystified ABI provided a one-page response to the Medical Center's request for clarification on February 12, 2001, emphasizing that the nearly four month delay was totally unnecessary.

69. On February 15, 2001, Dr. Mangano had a heated telephone conversation with Dr. Wallace regarding a dispute over publication rights for a particular study. The disagreement was totally unrelated to the issues reviewed by the ABI and, in fact, involved research misconduct by Dr. Wallace. Dr. Cason encouraged Dr. Wallace to write a letter regarding this conversation to the counsel for the Medical Center, Suzanne Will.

70. Despite the fact that the ABI had recommended no disciplinary action against Dr. Mangano, on March 19, 2001, Director Cullen terminated Dr. Mangano's employment, not based upon any breach of standards of clinical practice but because of his "behavior toward his colleagues." In the termination letter, Director Cullen based her decision upon allegations that Dr. Mangano had previously been "placed on administrative leave for prior verbal attacks toward" Dr. Wallace, which was inaccurate, and that "[o]n February 15, 2001 [Dr. Mangano] telephoned [Dr. Wallace] and again angrily berated him." The Medical Center never provided Dr. Mangano with an opportunity to explain what happened in the February 15, 2001 conversation with Dr. Wallace.

71. On May 25, 2001, the Medical Center Director sent Dr. Mangano another letter, purporting to terminate him again and purporting to supersede the March 19, 2001 letter, adding a new ground for the termination. In addition to the reasons stated in the March 19, 2001 termination, this letter stated that Dr. Mangano's suspension from UCSF meant that that Dr. Mangano no longer

held an "active" faculty position with UCSF.  Director Cullen now claimed that this meant that Dr.

Mangano could no longer supervise residents; thus, she was terminating him for this reason as well.

**E.     No Other Doctors Were Treated Similarly to Dr. Mangano**

72.     As the ABI suggested, the treatment of Dr. Mangano was very different from the way

that other "untoward events" involving *other* physicians at the SFVAMC were treated.  This was

likely the main reason the ABI called for standardization of the process for selection of cases to be

reviewed.

73.     There is not one other example of a case where the Medical Center denied a doctor

his ability to practice medicine based upon a patient care issue.  This is despite the fact that at the

SFVAMC there were many, far more serious patient care issues during and after Dr. Mangano's

time there.

74.     For example, according to sworn testimony given in a related matter, a heart surgeon

at the Medical Center frequently canceled planned heart surgeries—even after the patient had

already been brought into the operating room—due to his own lack of preparation.  In at least one

case, this led to a patient receiving an unnecessary sternotomy—an incision in the chest

approximately 30 centimeters long, essentially opening the chest—because the surgery was

canceled.  No one suspended or otherwise precluded that doctor from practicing medicine at the

SFVAMC.

75.     Another surgeon who worked at the Medical Center had, again according to sworn

testimony, a 50% mortality rate.  The standard mortality rate in heart surgery in the United States is

closer to 3% but in the case of this surgeon, 4 out of the 8 patients upon whom he operated died due

to his incompetence before he was quietly asked not to come back to the Medical Center.  His

patients died from excessive bleeding, infection, and, again according to sworn testimony,

"incompetent care" and "excessive by-pass runs."  One of these patients lingered near death for

months in the ICU after a botched surgery, yet the Medical Center never told his family that this was due to the surgeon's incompetence. This surgeon was not placed on administrative leave and, in fact, he is still working as a surgeon at UCSF today. This surgeon operated on patients at the SFVAMC at a time when he was supposed to be supervised by a senior attending physician. The Chief of Surgery, who was supposed to be supervising this new doctor, was out of town and not supervising him at all when he operated on his first patient, who subsequently died. Although required to do so, the Chief of Surgery never even completed a proctoring form for this doctor.

76.     During the time that Dr. Mangano worked at the Medical Center, numerous other far more serious adverse events received little or no attention, including the following:

- Cases where medical students were improperly supervised so that they mistakenly intubated patients in the esophagus instead of the trachea. This was not timely recognized, resulting in serious morbidity to the patients, including brain damage.

- A case where a patient in his mid-forties was in for relatively low-risk back surgery but died on the ward of a drug overdose.

- A case where a relatively healthy patient in his mid-forties was in for a minor bone graft procedure. The anesthesiologist twice intubated the patient in his esophagus, failed to recognize it, and the patient suffered brain death.

- An otherwise healthy patient was in for arthroscopic knee surgery, went home, and died from respiratory failure.

- A patient died because he was extubated—had his breathing tube removed—too early.

77.     None of the above-mentioned cases resulted in an emergency QA review or an ABI. In none of those cases was the physician suspended or placed on administrative leave. In Dr. Mangano's case, the patient left the hospital the next day on his own steam and later returned to

successfully complete the heart surgery.  Yet Dr. Mangano's case resulted in his removal from the operating room and the elimination of his clinical career, even though, once the matter was investigated, he was exonerated.

78.     The resulting impact on Dr. Mangano was devastating.  He has not practiced medicine since April 24, 2000.  His reputation as a clinician has been destroyed.  His ability to raise funds to continue his career as a researcher has been entirely compromised.  Sources of capital that would otherwise be available to pursue development of drugs for which Dr. Mangano holds licenses, have dried up.  As a result, Dr. Mangano, his foundation, IREF, and his company, AGTC,  have suffered massive amounts of monetary damages.

# V.  CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

79.     Dr. Mangano hereby incorporates by reference, as if fully set forth herein, the allegations of Paragraph 1 through 78 above.

80.     At the time of the above-described conduct, Dr. Cason and Director Cullen were employees of the Medical Center, an agency of the United States of America, and were each acting within the scope of his or her office or employment.

81.     The Medical Center's totally baseless campaign of attack on Dr. Mangano as a physician and clinician, as well as its blatant disregard of VA regulations federal laws governing its conduct, constituted extreme and outrageous conduct.

82.     Dr. Cason's and Director Cullen's conduct was committed with the intention of causing or in reckless disregard of the probability of causing emotional distress to Dr. Mangano.

83.     As an actual and proximate result of the Medical Center's extreme and outrageous actions, Dr. Mangano suffered severe or extreme emotional distress in the form of embarrassment, pain, suffering, and stress, valued at five million dollars ($5,000,000).

84.    If the Defendant were a private person, Defendant would be liable to Dr. Mangano in accordance with the laws of California.

85.    Pursuant to 28 U.S.C. § 2675(a), the claims set forth herein were timely presented to the Department of Veterans Affairs.  The Department of Veterans Affairs ultimately denied Dr. Mangano's request for reconsideration of the claim denial on January 14, 2005.

### SECOND CAUSE OF ACTION

### Intentional Interference with Right to Pursue Lawful Profession

86.    Plaintiff Dennis T. Mangano hereby incorporates by reference, as if fully set forth herein, the allegations of Paragraph 1 through 85, above.

87.    The unjustified and arbitrary administrative leave, unwarranted banishment from the Medical Center and subsequent termination, intentionally imposed by Director Cullen and the Medical Center, without an opportunity to respond to the underlying charges, the blatant disregard of the VA's regulations governing conduct of QA proceedings and ABI proceedings, as well as the other conduct described above, effectively eliminated Dr. Mangano's ability to practice clinically or conduct research in a clinical setting after 23 years of service.

88.    The Medical Center personnel, including Director Cullen, Dr. Cason and others, by their conduct, intended to interfere with Dr. Mangano's right to pursue and practice his profession as a physician and clinical researcher.

89.    The Medical Center's interference with Dr. Mangano's practice of his profession was committed by unlawful means, including but not limited to prohibited personnel practices under federal law and VA regulations, as well as by means which were lawful, but without sufficient justification as described above.

90.    Moreover, because the administrative leave arose from an investigation into patient care issues, and because Dr. Mangano was essentially removed from clinical practice and banned from the hospital, it was and is virtually impossible for Dr. Mangano to secure privileges at any

COMPLAINT                                      19.                    *PRINTED ON RECYCLED PAPER*

other hospital.  The acts of  Dr. Cason, Director Cullen and other personnel at the Medical Center, all acting within the scope of their employment, thus precluded Dr. Mangano from pursuing his lawful profession as a clinician and as a clinical researcher, as they intended when they committed the described acts.

91.     As a result, Dr. Mangano was deprived of the ability to practice medicine and to perform clinical research.  In addition, Dr. Mangano's standing in the medical and research community was forever marred by the Medical Center's actions, resulting in the loss of other employment opportunities for senior positions in clinical research with pharmaceutical companies and other entities.  Dr. Mangano thus suffered losses of past and future income in the sum of fifty million three hundred fifty thousand dollars ($50,350,000).

92.     Also as a result, Dr. Mangano's membership interest in Advanced Genomic Therapeutics Company, LLC (AGTC) has severely declined in value.  The actions of the Medical Center have made it very difficult, if not impossible, for Dr. Mangano to conduct clinical research for AGTC or to secure relationships with pharmaceutical companies or investors due to his inability to practice clinically and conduct clinical research.  Dr. Mangano has suffered resulting property damage in the sum of one hundred and fifty million dollars ($150,000,000).

93.     If the Defendant were a private person, Defendant would be liable to Dr. Mangano in accordance with the laws of California.

94.     Pursuant to 28 U.S.C. § 2675(a), the claims set forth herein were timely presented to the Department of Veterans Affairs.  The Department of Veterans Affairs ultimately denied Dr. Mangano's request for reconsideration of the claim denial on January 14, 2005.

## VI.  REQUESTED RELIEF

WHEREFORE, Plaintiff Dennis T. Mangano demands the following relief:

1.     Compensatory and special damages in the sum of  $205,350,000.

2.   Attorney's fees, to the extent permitted by 28 U.S.C.S. § 2678.

3.   Costs of suit, as permitted by 28 U.S.C.S. 2412(a).

4.   Post-judgment interest, as permitted by 31 U.S.C.S. § 1304(b) and 28 U.S.C.S. § 1961.

5.   Such other relief as this Court deems appropriate.

DATED: July 12, 2005

                                SUTHERLAND, ASBILL & BRENNAN LLP
                                Daniel Marino
                                Sarah Kleven

                                PRESTON GATES ELLIS LLP


                                By_/s/ D. Lilah McLean_____
                                   D. Lilah McLean
                                   Attorneys for Plaintiff
                                   Dennis T. Mangano, Ph.D., M.D.

K:\47624\00004\DL1B\DL1BP22GL==SFVAMC Final Complaint.doc